**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| MAX WEINSTEIN, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>SEATGEEK, INC.,<br><br>        Defendant. | Civil Action No.: 9:25-cv-81314-EA<br><br>**NOTICE OF SUPPLEMENTAL AUTHORITY** |

Pursuant to Local Rule 7.8, Plaintiff notifies the Court of *Tejon v. Zeus Networks, LLC*, 174 F.4th 1322 (11th Cir. 2026). *Tejon* is relevant to Seatgeek's pending motion to compel arbitration, as Plaintiff argued Seatgeek's hyperlinked terms were not reasonably conspicuous. ECF No. 28, pp. 6-16.

*Tejon* held the following webpage failed to form a contract under Florida law because the "hyperlink was not conspicuous." *Tejon*, 174 F.4th at 1327; *see id*. at 1324 (next page).

1



"*Berman* [*v. Freedom Financial Network LLC*, 30 F.4th at 849 (9th Cir. 2022)]… it is a good articulation of the same principles that Florida law embodies." *Id*. at 1326, n.1. "As in *Berman*, Zeus's hyperlink is not highlighted in a different color and is not in all capital letters." *Id*. 1327–28. The "hyperlink is… in a small font… [that] is easy to overlook given the larger font sizes and bolder colors of other elements on the page." *Id*. at 1327. "Although 'Terms of Service' is underlined … it is otherwise indistinguishable from the informational text of the same size and color surrounding it." *Id*. "Finally, and notably, Zeus's terms of service notice simply does not say anything about arbitration." *Id*. at 1328.

Dated: June 22, 2026                        Respectfully submitted,


                                            **BURSOR & FISHER, P.A.**

                                            By:      /s/ *Eleanor R. Grasso*
                                                     Eleanor R. Grasso (FBN 1065456)

                                            1330 Avenue of the Americas, 32nd Floor
                                            New York, NY 10019
                                            Telephone: (646) 837-7150
                                            Facsimile: (212) 989-9163
                                            Email:  egrasso@bursor.com

                                            Philip L. Fraietta (pro hac vice)
                                            50 Main Street, Suite 475
                                            White Plains, NY 10606
                                            Telephone: (914) 874-0710
                                            Facsimile: (914) 206-3656
                                            Email:  pfraietta@bursor.com

                                            Stefan Bogdanovich (pro hac vice)
                                            1990 North California Blvd., 9th Floor
                                            Walnut Creek, CA 94596
                                            Telephone: (925) 300-4455
                                            Facsimile:  (925) 407-2700
                                            E-mail:  sbogdanovich@bursor.com

                                            *Attorneys for Plaintiff*

3

**EXHIBIT A**

Tejon v. Zeus Networks, LLC, 174 F.4th 1322 (2026)

31 Fla. L. Weekly Fed. C 1210

174 F.4th 1322
United States Court of Appeals, Eleventh Circuit.

Roger TEJON, individually and on behalf of,
all others similarly situated, Plaintiff-Appellee,
v.
ZEUS NETWORKS, LLC, Defendant-Appellant.

No. 24-11114
|
Filed: 05/01/2026

**Synopsis**
**Background:** Subscriber to internet-based platform offering prerecorded video programming brought putative class action against platform operator, alleging operator shared subscriber's viewing history and personally identifiable information with a social media company without subscriber's consent and that this violated the Video Privacy Protection Act. The United States District Court for the Southern District of Florida, Paul C. Huck, J., 725 F.Supp.3d 1351, denied operator's motion to compel arbitration. Operator appealed.

**[Holding:]** The Court of Appeals, Kidd, Circuit Judge, held that under Florida law, website hyperlink that led to browsewrap agreement containing arbitration clause was not sufficiently conspicuous to put subscriber on notice of agreement's terms, rendering arbitration clause unenforceable.

Affirmed.

Branch, Circuit Judge, filed dissenting opinion.

**Procedural Posture(s):** On Appeal; Motion to Compel Arbitration.

West Headnotes (12)

**[1]** **Alternative Dispute Resolution** 🔑 Scope and standards of review

Court of Appeals reviews de novo district court's denial of motion to compel arbitration.

**[2]** **Alternative Dispute Resolution** 🔑 Constitutional and statutory provisions and rules of court

The Federal Arbitration Act (FAA) reflects a liberal federal policy favoring arbitration, but the federal policy is about treating arbitration contracts like all others, not about fostering arbitration. 9 U.S.C.A. § 1 et seq.

**[3]** **Federal Courts** 🔑 Alternative dispute resolution

Under the Federal Arbitration Act (FAA), state law determines whether an arbitration agreement exists. 9 U.S.C.A. § 1 et seq.

**[4]** **Copyrights and Intellectual Property** 🔑 Technology and software licenses

Florida recognizes two categories of internet agreements: clickwrap agreements and browsewrap agreements; a "clickwrap agreement" requires a user to check a box or click a button to acknowledge acceptance of the agreement's terms and conditions, while, by contrast, a "browsewrap agreement" contains hyperlinked terms, and the user's consent is implied by continued use of the website.

**[5]** **Copyrights and Intellectual Property** 🔑 Technology and software licenses

Florida courts will enforce browsewrap agreements against consumer only if consumer has actual knowledge of terms and conditions, or when hyperlink to terms and conditions is conspicuous enough to put reasonably prudent person on inquiry notice.

**[6]** **Copyrights and Intellectual Property** 🔑 Technology and software licenses

To determine whether hyperlink is sufficiently conspicuous to allow enforcement of

**Tejon v. Zeus Networks, LLC, 174 F.4th 1322 (2026)**

31 Fla. L. Weekly Fed. C 1210

browsewrap agreement, Florida law requires evaluation of general design and content of page containing hyperlink.

[7]     **Copyrights and Intellectual Property** 🔑 Technology and software licenses

Under Florida law, anyone who seeks to enforce an arbitration clause through a browsewrap agreement must prominently display the hyperlink that leads to the clause; consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to ferret out hyperlinks.

[8]     **Copyrights and Intellectual Property** 🔑 Technology and software licenses

Florida's inquiry notice standard for enforcement of a browsewrap agreement demands conspicuousness tailored to the reasonably prudent Internet user, not to the expert user, so the design of the hyperlinks must put such a user on notice of their existence.

[9]     **Copyrights and Intellectual Property** 🔑 Technology and software licenses

Under Florida law, in determining whether a hyperlink is sufficiently conspicuous to allow enforcement of browsewrap agreement, relevant design elements of web page include the location of the hyperlink on the page, its proximity to buttons the user must click, and its font size, format, and color.

[10]    **Copyrights and Intellectual Property** 🔑 Technology and software licenses

Under Florida law, in determining whether a hyperlink is sufficiently conspicuous to allow enforcement of browsewrap agreement, it is relevant whether the page provided an explicit

textual notice that taking a certain action would constitute acceptance of the website's terms.

[11]    **Copyrights and Intellectual Property** 🔑 Technology and software licenses

Under Florida law, hyperlink on website's subscription page that led to browsewrap agreement, which included an arbitration clause, was not sufficiently conspicuous to put website user on inquiry notice of browsewrap agreement's terms, rendering arbitration clause unenforceable in user's action against website operator alleging violation of Video Privacy Protection Act, where hyperlink was placed beneath two large, red action buttons, hyperlink was printed in a small font on bottom half of page and was easy to overlook given the larger font sizes and bolder colors of other elements on the page, and hyperlinked terms appeared in a dim, grey color. 18 U.S.C.A. § 2710.

More cases on this issue

[12]    **Copyrights and Intellectual Property** 🔑 Technology and software licenses

Under Florida law, to support enforcement of browsewrap agreement, the critical text must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.

Appeal from the United States District Court for the Southern District of Florida, D.C. Docket No. 1:24-cv-20498-PCH

**Attorneys and Law Firms**

Manuel S. Hiraldo, Hiraldo, PA, Lauderdale-by-the-Sea, FL, Michael Eisenband, Fort Lauderdale, FL, Jacob Phillips, Jacobson Phillips PLLC, Winter Park, FL, Jibrael Jarallah Said Hindi, Law Offices of Jibrael S. Hindi, Fort Lauderdale, FL, for Plaintiff-Appellee.

Jeffrey Robert Geldens, Caroline Sand, Todd R. Ehrenreich, Lewis Brisbois Bisgaard & Smith, LLP, Coral Gables, FL, Defendant-Appellant.

Before Rosenbaum, Branch, and Kidd, Circuit Judges.

**Opinion**

Kidd, Circuit Judge:

**\*1324**  Zeus Networks, LLC, wants to bind Roger Tejon to an arbitration agreement found on its internet-based platform. But Zeus chose to bury the page containing that agreement behind a hyperlink that itself was written in small, gray text that Tejon did *not* have to click. This text was located beneath large, red action buttons that Tejon *did* have to click. Was the hyperlink text enough to put Tejon on notice that clicking on the large, red buttons would subject him to binding arbitration? We find that it was not.

## I. BACKGROUND

Zeus operates an internet-based platform that offers prerecorded video programming to those who subscribe to its services. Roger Tejon visited Zeus's platform using an Apple iOS device and subscribed to Zeus's services.

When Tejon registered for the account with Zeus, he had to go to a subscription page titled "Choose your plan." That page presented the user with two large, red buttons: one for an annual subscription and the other for a monthly subscription. Beneath those large, red buttons was much smaller, gray, hyperlinked text for "Terms of Service." The page looked like this:



**\*1325**  Notably, the terms of service hyperlink was among the smallest and least visible text on the page, which also set forth the age restriction and the auto-renewal payment structure of the subscription. The terms of service hyperlink led to a different page with a mandatory arbitration clause. After he subscribed, Tejon used his digital subscription to view programming on Zeus's platform while logged into a social media account. Tejon alleges that Zeus shared his viewing history and personally identifiable information with the social media company without his consent. Tejon then sued Zeus for violating the Video Privacy Protection Act, 18 U.S.C. § 2710.

Zeus moved to compel arbitration pursuant to its terms of service, and it argued that Tejon consented to the terms of service when he signed up for a Zeus account. After reviewing Zeus's subscription page, the district court denied Zeus's motion to compel arbitration. It concluded that Zeus's agreement was not conspicuous enough to put a reasonably prudent person on inquiry notice of the arbitration provision at issue. We review that decision on appeal.

## II. STANDARD OF REVIEW

 **[1]**  We review de novo a district court's denial of a motion to compel arbitration. *JPay, Inc. v. Kobel*, 904 F.3d 923, 928 (11th Cir. 2018).

*1326 **III. DISCUSSION**

A. *Inquiry Notice*

[2] [3] The Federal Arbitration Act ("FAA") reflects a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011) (citation omitted). But "[t]he federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418, 142 S.Ct. 1708, 212 L.Ed.2d 753 (2022). Under the FAA, state law determines whether an arbitration agreement exists. *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1330 (11th Cir. 2016). The parties agree that Florida law applies to this case.

[4] Florida recognizes two categories of internet agreements: clickwrap agreements and browsewrap agreements. *MetroPCS Commc'ns, Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. Dist. Ct. App. 2018) (citing *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 762 (Fla. Dist. Ct. App. 2017)). A clickwrap agreement requires a user to check a box or click a button to acknowledge acceptance of the agreement's terms and conditions. *Id.* By contrast, a browsewrap agreement contains hyperlinked terms, and the user's consent is implied by continued use of the website. *See id.* The parties do not dispute that the arbitration agreement at issue was contained within a browsewrap agreement on Zeus's subscription page.

[5] Browsewrap agreements can be problematic because "consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).[1] Florida courts will enforce such agreements only if the "purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice." *MetroPCS Commc'ns*, 273 So. 3d at 1028 (quoting *Vitacost.com*, 210 So. 3d at 762). The parties in this case focus on whether Tejon had inquiry notice of the arbitration clause.

[6] To determine whether a hyperlink is sufficiently conspicuous, Florida law requires an evaluation of the general design and content of the page containing the hyperlink. *See, e.g.*, *Vitacost.com*, 210 So. 3d at 763–64, 766 (finding

hyperlink was not sufficiently conspicuous where purchaser had to scroll through multiple pages before the hyperlink appeared at the very bottom of the seller's webpage); *Mia. Dolphins, Ltd. v. Engwiller*, 410 So. 3d 685, 689–90 (Fla. Dist. Ct. App. 2025) (holding hyperlink was sufficiently conspicuous to place a reasonable user on inquiry notice where the hyperlink was bolded, appeared in a brightly colored ink, and was displayed at the center of the page).

[7] [8] Anyone who seeks to enforce an arbitration clause through a browsewrap agreement must prominently display the hyperlink that leads to the clause. "Consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to ferret out hyperlinks." *Mia. Dolphins*, 410 So. 3d at 689 (citation modified). In other words, the "inquiry notice standard *1327 demands conspicuousness tailored to the reasonably prudent Internet user, not to the expert user, [so] the design of the hyperlinks must put such a user on notice of their existence." *Berman*, 30 F.4th at 857 (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177, 1179 (9th Cir. 2014)).

[9] [10] Relevant design elements include the location of the hyperlink on the page, its proximity to buttons the user must click, and its font size, format, and color. *See Mia. Dolphins*, 410 So. 3d at 689–90. Also relevant is whether the page provided an explicit textual notice that taking a certain action would constitute acceptance of the website's terms. *See Berman*, 30 F.4th at 858 (finding the notice "I understand and agree to the Terms & Conditions" failed to explicitly notify users of the action they must take to consent to those terms and conditions because it lacked language such as, "By clicking the Continue >> button, you agree to the Terms & Conditions").

[11] Zeus's hyperlink was not conspicuous. First, Zeus placed it beneath two large, red action buttons that were prominently featured at the center of the page. When important terms are placed below a highly conspicuous action button, it is not reasonable to assume that users will continue scrolling past the action button. *See Vitacost.com*, 210 So. 3d at 765 ("Uniformly, courts have declined to enforce browsewrap agreements when the hyperlink to the terms and conditions is buried at the bottom of the page ...." (citation modified)); *Specht v. Netscape Commc'ns. Corp.*, 306 F.3d 17, 31–32 (2d Cir. 2002) (finding that placement of a notice of license terms below a download button was "not sufficient to [put] consumers on inquiry ... notice of those terms").

 [12]  We next examine the font size of the notice. The critical text "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856; *see, e.g.*, *Mia. Dolphins*, 410 So. 3d at 689–90. Zeus's terms of service hyperlink is printed in a small font on the bottom half of the page. It is easy to overlook given the larger font sizes and bolder colors of other elements on the page. *Berman*, 30 F.4th at 857 ("The comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else."). Although "Terms of Service" is underlined, indicating the presence of a hyperlink, it is otherwise indistinguishable from the informational text of the same size and color surrounding it.

As to color, all the text below the red action buttons, including the hyperlinked terms, appears in a dim, gray color. In *Berman*, the Ninth Circuit also considered whether a hyperlink appearing "in a tiny gray font," without more, sufficiently drew a user's attention. *Berman*, 30 F.4th at 854. The court found that it did not. *Id.* at 856–57. The Ninth Circuit opined, "[W]hile it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent." *Id.* at 857. "Simply underscoring words or phrases ... will often be insufficient to alert a reasonably prudent user that a clickable link exists." *Id.* The court noted that customary design elements that signal the existence of a hyperlink, such as "the use of a contrasting font color (typically blue) and the use of all capital letters," could indicate to users that the text is not ordinary but instead provides a clickable pathway to another page. *Id.*; *see, e.g.*, *Mia. Dolphins*, 410 So. 3d at 689–90.

As in *Berman*, Zeus's hyperlink is not highlighted in a different color and is not in all capital letters. The surrounding clutter regarding payment details and age requirements competes for the user's attention **\*1328** and further obscures the terms. *Cf. Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (finding a browsewrap agreement that was hyperlinked in a blue color and underlined provided reasonably conspicuous notice where the payment screen was "uncluttered, with only fields for the user to enter his or her credit card details, buttons to register for a user account ..., and the warning that 'By creating an ... account, you agree to the TERMS OF SERVICE & PRIVACY POLICY' ").

Finally, and notably, Zeus's terms of service notice simply does not say anything about arbitration. It would have been simple enough for Zeus to state plainly that clicking on one of the red buttons would subject any dispute between the user and Zeus to binding arbitration. Zeus's hyperlink text also could have said "ARBITRATION AGREEMENT." Zeus chose instead to place the provision on a separate terms of service page. Having made that choice, it was required to design its website to ensure that a reasonable user would know to click to view the terms of service page, and it failed to do so.

None of the things that we have discussed—location on the page, font size, contrasting color, capital letters, underlining, informational content, and so forth—is individually required to pass a conspicuousness assessment. The point of these design elements is to place a reasonably prudent internet user on notice of the agreement at issue. The internet site owner may utilize some combination of these elements, or perhaps something else entirely, to bring attention to the agreement. Even better, the owner could use a clickwrap agreement. But Zeus chose to do none of this.

We find that Tejon was not on inquiry notice of the terms of service or the arbitration agreement.

## B. *Incorporation*

Zeus also urges us to find that Tejon's subscription agreement, via the hyperlinked terms of service, incorporated the clause requiring disputes to be arbitrated. Because we find that Tejon was not on inquiry notice of the terms of service, we need not reach Zeus's incorporation argument.

## IV. CONCLUSION

We **AFFIRM** the district court's order denying the motion to compel arbitration.

Branch, Circuit Judge, dissenting:
In 2023, Roger Tejon subscribed to Zeus Networks, LLC's subscription video platform by clicking on a button in the center of Zeus's subscription webpage. Directly under that button was a hyperlink leading prospective customers to Zeus's terms of service, including a mandatory arbitration clause. Was that hyperlink conspicuous enough to put Tejon on inquiry notice of the terms and conditions—including the compulsory arbitration clause therein—such that Tejon

agreed to be bound by those terms when he subscribed to Zeus's service? The Majority, affirming the district court, concludes not; I disagree.

Tejon was on notice of the conspicuous hyperlink to the terms of service. The hyperlink was centrally positioned directly beneath the action buttons, where the user's attention is easily drawn; colored in light gray to contrast with the black background; underlined; appeared the same size as most of the text on the page; and set apart from a block of text below. A reasonably prudent person would not have missed it. Thus, I would reverse the district court and compel Tejon to participate in arbitration pursuant to Zeus's terms of service. Accordingly, I respectfully dissent.

### *1329  I. BACKGROUND

In November 2023, Tejon visited Zeus's website and subscribed using an iOS device. Zeus's subscription page appeared as follows:



Tejon subscribed to Zeus's service by clicking on the red $5.99-per-month option.[1] Tejon did not have to click any other buttons on the page to advance in the subscription process, and neither party alleges that Tejon in fact clicked the "Terms of Service" hyperlink, located just beneath the red subscription buttons, and viewed its contents. Had Tejon clicked the "Terms of Service" hyperlink, he would have navigated to a page containing Zeus's terms of service, including a mandatory arbitration clause requiring users to arbitrate "any dispute with [Zeus] arising out of or relating to [their] purchase or viewing of [Zeus's] Program or subscription channel."

After subscribing, Tejon sued Zeus alleging that it misused his personal data by sharing it with third parties without authorization. Zeus moved to compel arbitration based on the mandatory arbitration clause in its terms of service.

The district court denied Zeus's motion to compel arbitration. It found that the "color, size, positioning, language, and design of the hyperlink and its accompanying text" "weigh[ed] in favor of finding that the hyperlink and related text fail[ed] to provide inquiry notice" of the arbitration provision, "rendering the provision unenforceable." According to the district court, **1330 "Zeus did not sufficiently bold, enlarge, or display its hyperlinks in the usual blue font," and thus the hyperlink was "overshadowed by large, bright red action buttons above [it]."

Zeus timely appealed.

### II. STANDARD OF REVIEW

"We review *de novo* a district court's denial of a motion to compel arbitration." *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1328 (11th Cir. 2016).

### III. DISCUSSION

The contract formation issue in this case concerns an electronic contract. Under Florida law,[2] courts treat the issue of mutual assent (*i.e.*, offer and acceptance) differently depending on whether the user agreement is a clickwrap or browsewrap agreement. *Vitacost.com, Inc. v. McCants*, 210 So. 3d 761, 762 (Fla. 4th DCA 2017).

Clickwrap agreements require a purchaser to affirmatively acknowledge acceptance of the sale's terms and conditions before completing a transaction. *Id.* Browsewrap agreements, on the other hand, are websites that "merely provide[ ] a link to the terms and conditions and do[ ] not require the purchaser to click an acknowledgement during the checkout process." *Id.* The parties agree that Zeus's subscription page is a browsewrap agreement.

In Florida, browsewrap agreements are enforceable only "when the purchaser has actual knowledge of the terms and conditions, or when the hyperlink to the terms and conditions is conspicuous enough to put a reasonably prudent person on inquiry notice" of the terms and conditions. *Id.*; *see also*

*MetroPCS Commc'ns Inc. v. Porter*, 273 So. 3d 1025, 1028 (Fla. 3d DCA 2018). The parties do not dispute that Tejon did not have actual knowledge of Zeus's terms of service in general or the arbitration clause specifically. Thus, I focus on whether Zeus's terms of service hyperlink with the arbitration provision was "conspicuous enough to place a reasonably prudent person on inquiry notice." *Vitacost.com*, 210 So. 3d at 762. [3]

Whether a hyperlink is conspicuous enough to put a reasonably prudent person on inquiry notice is a "fact-intensive inquiry" under which "the design and content of the relevant interface are especially relevant." *Eglin Fed. Credit Union v. Baird*, 400 So. 3d 643, 647 (Fla. 1st DCA 2024) (quotation omitted), *jurisdiction accepted on other grounds*, No. 2025-0221, 2025 WL 2555729 (Fla. Sept. 4, 2025) (mem.). Florida courts have looked to a variety of webpage features in analyzing browsewrap agreements. *See id.* at 647–48; *see also Miami Dolphins, Ltd. v. Engwiller*, 410 So. 3d 685, 689–90 (Fla. 3d DCA 2025); *Vitacost.com*, 210 So. 3d at 762–65. While certain features like webpage and hyperlink **\*1331** design, size, and positioning may emerge from the cases as aspects that courts analyze when determining inquiry notice, no Florida court has yet broken down the analysis into distinct factors for courts to consider separately. [4] *See Miami Dolphins,* 410 So. 3d at 689–90; *Vitacost.com*, 210 So. 3d at 762–65; *MetroPCS*, 273 So. 3d at 1028–29; *Eglin Fed. Credit Union*, 400 So. 3d at 648. As such, I decline to follow the Majority's approach, and instead follow the Florida courts' holistic method.

### i. Zeus's Hyperlink was Conspicuous

I begin with the two principal browsewrap webpage cases decided by Florida courts, *Miami Dolphins* and *Vitacost.com*, each providing an example of conspicuous and inconspicuous hyperlink designs, respectively. In *Miami Dolphins*, the Third District Court of Appeal of Florida ("DCA") found the terms of use hyperlink in the image below conspicuous because it "was displayed on the center of the page" and was "offset" from the few other features on the page—log-in fields, a sign-in button, and a temporary account update notice:



**\*1332** 410 So. 3d at 689. [5] The hyperlink's conspicuousness to the reasonably prudent person was further enhanced because it was "bolded and offset from the rest of the page in a contrasting, brightly colored aqua ink," despite being the same size as the surrounding text. *Id.* at 689. Finally, the hyperlink was "prominently placed" **\*1333** "between the two log-in fields—username and password—and the sign-in button." *Id.* Put simply, it was placed in direct proximity to the page features which unavoidably drew the user's attention. *See id.*, at 689–90; *see also Derriman v. Mizzen & Main LLC*, 710 F. Supp. 3d 1129, 1140 (M.D. Fla. 2023) (concluding that hyperlink was conspicuous when "prominently placed" next

to a " 'GET 15% OFF' button"); *Kravets v. Anthropologie, Inc.*, 2022 WL 1978712, at *4–5 (S.D. Fla. June 6, 2022) (holding that hyperlinks were conspicuous when located directly above a "GET FREE SHIPPING NOW" button); *Bell v. Royal Seas Cruises, Inc.*, 2020 WL 5639947, at *6 (S.D. Fla. Sept. 21, 2020) (concluding that hyperlink was conspicuous when placed directly above a "Continue" button that the user had to click). [6]

In contrast, the court in *Vitacost.com* found Vitacost's terms of service hyperlink to be inconspicuously located on the webpages at issue in that case. 210 So. 3d at 762–66. The locations of Vitacost's terms of service hyperlink on the webpages are shown in the following two images. The first image is a screenshot of the bottom of Vitacost's product page, where its standard terms of service hyperlink could be located after scrolling a significant distance:



*Vitacost.com,* 210 So. 3d at 763. The second webpage reflects Vitacost's checkout webpage upon which the user would complete his transaction:



**\*1334**  *Id.* at 764. As the images above show, the terms of service hyperlink was placed far from the action points that would draw the reasonably prudent user's attention and appeared in small text, at the bottom of pages filled with extensive, larger text and multiple images. *Vitacost.com,* 210 So. 3d at 763–64.

The first image is particularly illustrative—it shows the hyperlink "buried at the bottom of the page" which a user could only reach if he "scroll[ed] through multiple pages of products before reaching the bottom [of the page] where the link [was] located." *Id.* at 763, 765; *see also MetroPCS Commc'ns,* 273 So. 3d at 1028–29 (noting that a hyperlink "buried in pages of information or hidden at the foot of a webpage" is not conspicuous enough to give rise to inquiry notice).

Even in the second image, which is a single webpage (no scrolling necessary) with the hyperlink appearing (per affidavits) in "bright blue font," the hyperlink is buried in the bottom right corner of the screen, far from the features likely to draw attention. *Vitacost.com,* 210 So. 3d at 763–64 (quotations omitted). As such, it is no surprise that the DCA concluded that Vitacost's terms of service hyperlink was inconspicuously positioned such that a reasonably prudent person would not be on inquiry notice. *Id.* at 765–66.

In this case, the design of Zeus's webpage is closely analogous to the one in *Miami Dolphins,* and quite unlike the one in *Vitacost.com.* Like the webpage in *Miami Dolphins,* Zeus's webpage had few features, centrally located in a basic contrasting color scheme with text and no images, making the hyperlink easy for a reasonably prudent person to locate. Unlike in *Vitacost.com,* Zeus has not cluttered its webpage with a slew of extraneous information—only what is necessary is included—all **\*1335** of which is available on a single page, no scrolling required. The hyperlink's color, while the same light gray as the other text, nonetheless starkly contrasted with the black background, making the hyperlink visible and readable. Furthermore, the hyperlink was underlined which, as the Majority notes, commonly indicates that the underlined web text is hyperlinked, further drawing the user's attention. *See Miami Dolphins,* 410 So. 3d at 689 (indicating that the hyperlink was bolded); *see also id.* at 690 (noting that hyperlinks are made more conspicuous when they are "bold and underlined" (citing *Kravets,* 2022 WL 1978712, at *4–5)). Finally, the hyperlink is positioned next to the bright red action buttons—which unavoidably attract the user's attention—increasing

the hyperlink's prominence. Thus, Zeus's terms of service hyperlink is conspicuous to the reasonably prudent person.

### ii. The Majority's Errors

Despite the facts and caselaw explained above, the Majority concludes that the hyperlink is inconspicuous. Its analysis, however, suffers from two flaws: first, it relies heavily on non-precedential, out-of-state caselaw that distorts its analysis; and second, the Majority concludes that the hyperlink's location immediately beneath the action buttons is a flaw, not a feature, of its design. I address each error in turn.

The first error is that the Majority unnecessarily rests significant portions of its analysis on out-of-state cases. These are *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849 (9th Cir. 2022), a Ninth Circuit case applying New York and California law; as well as *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66 (2d Cir. 2017) and *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002), two Second Circuit cases applying California law. But even though Florida courts have cited to some parts of these cases, Florida caselaw—like *Miami Dolphins* and *Vitacost.com*—remains the *binding* authority governing this analysis, whereas the analyses of these out of state cases are merely persuasive except to the extent a Florida court has squarely adopted them. Only *Berman* can claim that distinction—the Florida courts merely referenced the other two cases for broad, general principles of contract formation law rather than adopting any part of their dispositive reasoning. *See Eglin*, 400 So. 3d at 647 (citing *Meyer* for the proposition that the conspicuousness analysis is a fact-intensive inquiry); *Vitacost.com*, 210 So. 3d at 762 (citing *Specht* within a quote of another case, *Nguyen v. Barnes & Noble*, Inc., 763 F.3d 1171, 1175–76 (9th Cir. 2014), for the proposition that mutual assent is the "touchstone of contract," even online (quotations omitted)).

As for *Berman*, while the court in *Miami Dolphins* quoted two parts of the Ninth Circuit's reasoning, both are consistent with my analysis above. First, the DCA adopted the proposition that "consumers cannot be required to hover their mouse over otherwise plain-looking text or aimlessly click on words on a page in an effort to ferret out hyperlinks." *Miami Dolphins*, 410 So. 3d at 689 (quoting *Berman*, 30 F.4th at 857) (quotation omitted and alterations adopted). No issue here, as Zeus's terms of service hyperlink was underlined, marking it as different from surrounding text. Second, in concluding that

the hyperlink in question was sufficiently conspicuous to give a user proper notice, the DCA cited *Berman*, explaining in a parenthetical that

> A web designer must do more than simply underscore the hyperlinked text in order to ensure that it is sufficiently set apart from the surrounding text. Customary design elements denoting the existence of a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital letters, both of **\*1336** which can alert a user that the particular text differs from other plain text in that it provides a clickable pathway to another webpage.

*Miami Dolphins*, 410 So. 3d at 689–90 (quoting *Berman*, 30 F.4th at 857). Again, no issue here. As I explained above, Florida takes a holistic approach to determining if a webpage has done enough to make a hyperlink conspicuous —no single "customary design element" is the *sine qua non* of conspicuousness. *Id.* True, Zeus's hyperlink did not use all caps or a font color that contrasted from the color of the other text on the page; but for all the reasons I set out above, Zeus did more than enough to make the terms of service hyperlink easy to identify and conspicuously located within an uncluttered webpage, consistent with controlling Florida caselaw.

The second error of the Majority is in concluding that Zeus made the hyperlink inconspicuous by placing the "[terms of service] hyperlink ... *beneath* two large, red action buttons that were prominently featured at the center of the page" (emphasis added). But I can find no Florida case announcing a rule that placing a hyperlink below a webpage's action points, regardless of proximity, always decreases its conspicuousness. Rather, Florida caselaw suggests the opposite conclusion: that proximity to action buttons, whether above or below, is a feature, not a flaw. For instance, while the hyperlink in *Miami Dolphins* was placed just above the action "Sign In" button, nothing in the DCA's analysis suggests that the placement of the hyperlink above, and not below, the action button was of any significance. *See Miami Dolphins*, 410 So. 3d at 689–90. Instead, the DCA emphasizes that the general placement of the hyperlink among the action

features enhanced its conspicuousness, *id.*, just as the court in *Vitacost.com* frowned on the hyperlink's position far from the action points. *See Vitacost.com*, 210 So. 3d at 763–65. Thus, what matters is not whether a hyperlink like Zeus's is above or below action buttons, but whether its position attracts a user's attention in the context of its surrounding webpage. Here, Zeus's hyperlink is prominently placed in an attention-grabbing location next to the action buttons that draw a user's attention. That design is enough to place a reasonably prudent person on inquiry notice under Florida law.

## IV. CONCLUSION

Given the hyperlink's conspicuous position, size, color, and emphasis, placed in the overall context of the minimalist page design, I would find that Tejon was on inquiry notice of the terms and conditions to which the hyperlink connects, including the mandatory arbitration clause, and would reverse the district court. I respectfully dissent.

### All Citations

174 F.4th 1322, 31 Fla. L. Weekly Fed. C 1210

## Footnotes

1     *Berman* is a Ninth Circuit decision that applies either New York or California law. Still, it is a good articulation of the same principles that Florida law embodies. For example, Florida's Third District Court of Appeal in *Miami Dolphins* applied *Berman* when assessing conspicuousness. *Mia. Dolphins, Ltd. v. Engwiller*, 410 So. 3d 685, 689–90 (Fla. Dist. Ct. App. 2025). Plus, *Berman* applies similar law to closely analogous facts.

1     As some readers of this opinion may be reading it in grayscale, here is a summary of the colors of the webpage. Against the jet-black background of the page, Zeus used three colors for its features. The header "Choose your plan" is in white text. The two action buttons are bright red, with white font used for the text within them. The rest of the text is a pale gray color that contrasts against the black background.

      Also, for the benefit of the reader, throughout this opinion I circle in red the relevant terms of service hyperlink on each example webpage.

2     Whether a party to a contract has entered an agreement to arbitrate is determined under "ordinary state-law principles that govern" contract formation. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Here, the parties do not dispute that Florida law applies.

3     Florida courts have handled few cases concerning the conspicuousness of hyperlinks in the context of browsewrap-type webpages. Of these, only two cases, *Miami Dolphins* and *Vitacost.com*, involve analogous fact scenarios involving webpages. *See Miami Dolphins,* 410 So. 3d at 689–90; *Vitacost.com*, 210 So.3d at 762–65. Other Florida cases involve text and e-mail messages, which are meaningfully different. *See e.g.*, *Eglin Fed. Credit Union*, 400 So. 3d at 645-46 (email notice); *MetroPCS Commc'ns Inc.,* 273 So. 3d at 1026-27 (text messages). As such, my analysis relies heavily on *Vitacost.com* and *Miami Dolphins* and cites to other cases only to the extent that they stand for generally applicable principles.

4     The Majority uses five separate factors as guardrails for its analysis: hyperlink location and proximity to action buttons; font size, format, and color; and whether the page provides an explicit textual notice that taking an action constitutes acceptance of the hyperlinked terms. While Florida courts have certainly looked to those factors in substance, they have not expressly identified them such that we can state, definitively, that they reflect the Florida courts' chosen analytical structure.

**Tejon v. Zeus Networks, LLC, 174 F.4th 1322 (2026)**
31 Fla. L. Weekly Fed. C 1210

5       The image of the webpage at issue in *Miami Dolphins* is drawn from the filings in that case, of which we take judicial notice. *See United States v. Jones,* 29 F.3d 1549, 1553 (11th Cir.1994).

6       I rely on these three district court cases because the specific analogous facts I cite here were quoted with approval by the DCA in *Miami Dolphins* in reaching its conclusion that the hyperlink at issue there was conspicuous.

---

**End of Document**                                     © 2026 Thomson Reuters. No claim to original U.S. Government Works.